UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GREGORY BORCYK,

                    Petitioner,              **No. 10-CV-6137(MAT)**
                                             **DECISION AND ORDER**

        -vs-

JOHN LEMPKE, Superintendent,

                    Respondent.
_____

## I.    Introduction

Presently pending before the Court is the pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Gregory Borcyk ("Petitioner" or "Borcyk"), who is incarcerated pursuant to a judgment of conviction entered on July 6, 2005, in Monroe County Court, on one count of second degree (intentional) murder.

## II.   Factual Background and Procedural History

### A.    The Crime and Petitioner's Arrest

On October 26, 2002, in the Town of Greece, New York, the naked corpse of Maria Ortiz ("Ortiz") was found on the side of Ling Road by a passing motorist. During their investigation, police learned that Ortiz was an addict who sold drugs from her home and prostituted herself to obtain drugs.

After submitting a sample of semen taken from Ortiz's vagina to a national DNA database, the authorities received notification in December 2004, that it was a positive match to Borcyk, a prior Federal felony offender. At the time of the murder, Borcyk was

living about seven-tenths of a mile from the location where Ortiz's body was found.

Borcyk subsequently was questioned by the police and admitted to having a drug habit and soliciting sex with prostitutes in the past. However, he vehemently denied knowing Ortiz. When confronted with evidence that DNA matching his genetic profile was found on Ortiz's body, Borcyk maintained that he had never met Ortiz and had never had sexual relations with her. Borcyk eventually was arrested and charged with second degree (intentional) murder.

**B.   The Trial**

### 1.   The Discovery of Ortiz's Body and the Cause of Death

Carmen Benitez ("Benitez"), Ortiz's sister, testified that she last saw Ortiz alive on October 24, 2002. Ortiz was wearing blue jeans and a yellow t-shirt, which were found in a garbage can outside of her apartment. Susan Casper ("Casper") testified that as she was driving on Ling Road near the intersection of Kirkwood Road on October 26, 2002, she noticed a woman's naked body in a wooded area. The police officers who responded to the crime scene found no footprints or drag-marks near Ortiz's body.

Dr. Scott LaPoint ("Dr. LaPoint"), a deputy medical examiner with Monroe County, conducted the autopsy of Ortiz. He testified the cause of death was strangulation, and that it probably was manually done. Dr. LaPoint testified that Ortiz had not died of a drug overdose, notwithstanding the cocktail of many

drugs-prescription, non-prescription, and illegal-found in her system.

In cases of manual strangulation, Dr. LaPoint explained, defense wounds are commonly found on the victim's neck, resulting from the victim attempting to remove the assailant's hands. On Ortiz's neck, Dr. LaPoint noticed abrasions and scratch marks consistent with the type of self-defense wounds typically seen in cases of manual strangulation. Dr. LaPoint could not testify with certainty as to what caused them, although they appeared to have occurred while Ortiz was alive. He found no evidence of forcible rape or other sexual trauma.

### 2.   Borcyk's Statements

Sergeant Steven Chatterton ("Chatterton") of the Greece Police Department testified that on December 19, 2004, he met with Borcyk, who agreed to speak with him at his mother's home at 140 El Rancho Drive. Borcyk's driver's license indicated a previous residence of 4696 Dewey Avenue, which was about seven-tenths of a mile from where Ortiz's body was discovered.

Upon being a shown a photograph of Ortiz, Borcyk said she did not look familiar and that he did not know her. However, he indicated that a photo of Reinaldo Torres ("Torres"), Ortiz's then-boyfriend, looked familiar. Borcyk admitted to having a drug problem and still going on binges occasionally. He also admitted to having had sex with prostitutes in the 1990s but claimed he had not done so since that time. He reiterated that he did not know Ortiz and had never purchased drugs at Ortiz's apartment. When informed

that she had been murdered, Borcyk sat back in his chair and said, "'Oh, she was murdered?'". T.378.

The next day, the police stopped Borcyk's truck and asked him to come to the station with them. Borcyk agreed. After he was advised of his Miranda warnings, Borcyk was shown new photographs of Ortiz and, again, he denied knowing her. When he was again told that Ortiz had been murdered, he had the same reaction as he had the day before: He leaned back and said, "'She was murdered?' Like he was surprised." T. 386.

The officers told Borcyk that he had evidence linking him to the incident, and he repeated that he had never met her. When he was informed that there was DNA linking him to the crime, Borcyk adhered to his denials. Upon being informed that Ortiz had been discovered seven-tenths of a mile from his residence at the time of the murder, he smiled and commented, "That doesn't mean a thing." T.387.[1] The police obtained a DNA sample from Borcyk prior to terminating the interview.[2]

On December 23, 2004, Chatterton received the results from the testing performed Borcyk's recent DNA sample. Borcyk was brought to the police station that same day and given his Miranda warnings, which he waived. The officers informed Borcyk that he was under arrest for Ortiz's murder because his DNA had been found under

---

[1] Citations to "T.___" refer to pages in the transcript of Petitioner's trial.

[2] The police also submitted DNA samples from Reinaldo Torres; Sidney Lawhorn, Jr.; Jerome "Ricky" Blocker; and Carlos Abruzua for testing. T.405-08.

Ortiz's fingernails and in semen from her vagina. When asked to explain these results, Borcyk continued to deny knowing Ortiz. Chatterton described Borcyk's demeanor as very calm.

The police asked Borcyk if he did not believe that these DNA results existed, Borcyk responded, "My lawyer says there's no way you can have my DNA that fast." T.397. When asked who his lawyer was, Borcyk admitted that he did not have a lawyer and stated that it actually was a friend who had told him that.

The police provided Borcyk with the lab report to review, and he was questioned further about his involvement in the matter. Given another opportunity to explain the presence of his DNA on Ortiz's body, Borcyk reiterated that he did not know Ortiz. He retreated from his position that he had not had sex with prostitutes since the 1990s, admitted that he had done so as recently as 2001. (Ortiz was killed in October 2002.)

While Borcyk was being held in the County Jail, he had a telephone conversation with his mother, which was tape-recorded and introduced into evidence. During the conversation, Borcyk admitted that at the time Ortiz's body was found, he was living at an address nearby.

### 3.   Jameik Lawhorn and Sidney Lawhorn, Jr.

Sidney Lawhorn, Jr. ("Sidney") and Jameik Lawhorn ("Jameik"), his cousin were both sitting a car in a driveway across the street from Ortiz's house on Friday, October 25, 2002. Chatterton obtained a statement from Sidney on February 27, 2003, regarding the events of that evening. Sidney ultimately invoked his Fifth Amendment

privilege and refused to testify at Borcyk's trial, even under
penalty of perjury if he did not have a legitimate Fifth Amendment
privilege to invoke.[3] The parties stipulated that Sidney's
statement would be read into the record. In it, Sidney stated, in
relevant part, as follows:

> I know Maria Ortiz as China. On Friday night, October 25,
> 2002, at about 11:00 at night, I was outside my
> grandmother's house at 32 Remington Street in my sister's
> car . . . with my cousin Jameik and we were rolling
> blunts. . . . The car was backed into the driveway facing
> the abandoned house across the street. We were passing
> the blunt back and forth . . . and I saw Ricky Blocker
> and these two Hispanic dudes walking up the driveway of
> China's house. . . .
>
> A little while later all three of the guys came out and
> they were talking to each other in the driveway. After a
> few minutes China came out and stood with the guys and
> they talked in Spanish. I saw Ricky Blocker start to walk
> across the street and I knew that he was going to get
> drugs. As Ricky wacked across the street, China went back
> into the house. The two Hispanic dudes stood at the end
> of the driveway and watched Rick like they thought he was
> going to run off with the money. I high-beamed Rick . .
> . to get his attention. Rick then walked over to me and
> I gave him five bags of crack . . . [for] a $20 bill and
> two $100 bills . . . . Rick then went back to China's
> house and they all went inside. We ended up sitting there
> for a few minutes because we thought they might come back
> for more.
>
> Jameik and I went to the store and when we came back
> there was a car parked in the driveway. The car that was
> in the driveway was originally in the street before we
> left. The car was an older model Toyota Camry. It was a
> four-door car and it was boxy-looking. It is hard to
> describe the color but it was goldish-gray. The car was
> backed into the driveway and the side porch light was
> off. Before we went to the store the light was on. I
> backed my sister's car into the driveway and Jameik told

---

[3]
    Sidney also refused to speak about Ortiz with the private investigator
hired by defense counsel, stating, "I want nothing to do with this shit!"
Affidavit of Jack W. Altpeter, Jr., LPI at 2, ¶3, submitted in support of
Petitioner's C.P.L. § 440.10 Motion (Resp't App. A).

me to go see if they were straight . . . [i.e.] if they
wanted more drugs. As I walked up the driveway, I saw the
door open and Ricky started coming out of the house and
I could see that he was holding China's feet. I ducked
down behind the bushes and then I saw one of the Hispanic
dudes carrying the rest of China. I saw them put China in
the trunk of the car that was in the driveway. The one
Hispanic guy was wearing a red knit hat, and after they
put China in the trunk he started getting all mad and
saying stuff in Spanish. I don't understand Spanish but
I could tell he was pissed.

After they put China in the trunk I went back and got in
my Sister's car. I saw the [Camry] . . . pull out of the
driveway. I waited a little bit . . . and I followed it
down Remington Street to Avenue A. At Avenue A I turned
left and went to Clinton Avenue. The car that was in
China's driveway kept going down Remington Street. When
I got on Clinton Ave. at Norton I saw the car make a
right from Norton Street to Clinton Ave. and go toward
the expressway. I never told Jameik that I saw the body
because was freaked out, shocked and scared.

When this first happened I spoke to Sergeant Chatterton
about some of the things I saw. I looked at some photos
and I showed Sergeant Chatterton Ricky Blocker and I
showed him one of the Hispanic dudes. Sergeant Chatterton
told me that the Hispanic dude that I picked out was
Reinaldo Torres. He was at the house but I didn't see him
carry the body. I did not know who the third Hispanic guy
with the red knit had that was carrying China's body. I
did not tell police everything that I knew because I was
nervous and feared for my safety.

In addition to that, I did not want to admit to selling
drugs. I tried to give police enough information to catch
the guys without getting me involved.

On the night before China's body was found the Hispanic
dude with the knit hat came back to China's house in a
small red car with a broken rear window. The guy saw me
and made a motion to his waistband like he had a gun. I
was scared.

Since then the same guy came up to me and said if you go
to the police, I'll kill you. I ran away and I've been
hiding ever since. Today I decided to talk to the police
again and tell them everything. I looked through the
computer at a bunch of photographs. I picked out the dude
with the knit hat. There is no doubt in my mind that he

-7-

> is the guy that was carrying China's body with Ricky
> Blocker. The guy was identified to me as Carlos Arbuzua.

T.427-30.

On November 22, 2002, Chatterton ("Chatterton") had spoken with Jameik who agreed with Sidney's story insofar as the two of them, while smoking blunts in Sidney's car, saw Blocker and two Hispanic males exit Ortiz's apartment. In contrast to Sidney, however, Jameik said that he never saw Ortiz that night.

On March 9, 2005, Chatterton spoke to Sidney again while Sidney was incarcerated. During this interview, Chatterton testified, Sidney "recanted" his February 2003 statement. T.400. After telling Chatterton, "'I saw what I saw,'" Sidney went on to state that he "definitely" saw Blocker and the two Hispanic males in Ortiz's driveway. With regard to whether he saw Ortiz's body, Sidney now stated that his "his mind was playing games on him and that he saw one of them or two of them go into the trunk, and he just assumed after a couple months of him thinking about it that they must have been putting her body into" the trunk. T.401. Sidney told Chatterton during this interview, "'I can't say I saw a foot, I can't say I saw a leg.'" T.401.

### 4.   The DNA Evidence

Ellyn Colquhoun ("Colquhoun"), a forensic biologist with the Monroe County Public Safety Laboratory, testified that she found two contributors to the DNA found in Ortiz's vagina. One contributor was female, and Ortiz could not be excluded as the donor. The other contributor was male. Comparing the male DNA from

Ortiz's vagina to the DNA on the buccal swab taken from Borcyk, Colquhoun stated that she could not exclude Borcyk as the donor of the DNA sample from Ortiz's vagina. In fact, Colquhoun found no "points of exclusion" during the comparison. T.488, 495.

With regard to the DNA found under Ortiz's fingernails, there again were two contributors-Ortiz and a male. Again, according to Colquhoun, the male contributor was Borcyk, and there were no points of exclusion. Arbuzua, Blocker, Torres, and Sidney were all excluded as the source of the DNA from either Ortiz's vagina or fingernails. T.491-92. Using the allele frequency database, Colquhoun compared Borcyk's DNA to that of the male contributor from the samples found on Ortiz. She determined that the probability of randomly selecting a person unrelated to Borcyk as the contributor of the male DNA found in Ortiz's vagina was less than one in 15.3 million. T.493-94. With regard to the fingernail clippings, the probability was less than one in 11.2 trillion. Id.

### 5.   The Defense Case

The defense theory focused on attempting to undermine the integrity of the evidence collection and storage practices of the forensics laboratory. Defense counsel also sought to show that there were inconsistencies in Colquhoun's analysis, namely, that at certain chromosomes, Borcyk appeared to be a major contributor while at others, he appeared to be a minor contributor. To that end, defense counsel called Gary Skuse, Ph.D. ("Skuse"), a professor of biology and the director of the bio-infomatics program at R.I.T., which specializes in applying computational technologies

to understanding biological data, including DNA. The gist of Skuse's testimony was that the inconsistency was an "artifact" which "represent[d] something that is misrepresenting the mixture that occurs in the laboratory." T.549.[4]

### 6.    The Verdict and Sentencing

The jury returned a verdict convicting Borcyk as charged in the indictment of intentional murder. He was sentenced to the maximum term possible, 25 years to life.

### B.    Post-Conviction Proceedings in State Court

Before perfecting his direct appeal, and represented by new counsel, Petitioner filed a motion in the trial court to vacate the judgment pursuant to Criminal Procedure Law ("C.P.L.") § 440.10. See Resp't App. A. The motion was denied on October 19, 2008, Resp't App. D, and leave to appeal to the Appellate Division, Fourth Department, was likewise denied on March 24, 2009, Resp't App. G.

After filing the C.P.L. § 440.10 motion, but before it was decided, petitioner perfected his direct appeal. The Appellate Division, Fourth Department unanimously affirmed the conviction on March 27, 2009, and the New York The Court of Appeals denied leave to appeal on July 1, 2009.

---

[4]
    The prosecutor pointed out during summation that Skuse had written to defense counsel and stated, in effect, that he agreed with Colquohoun's conclusions that the donors of the DNA under Ortiz's fingernails and in her vagina may be Ortiz and Borcyk. T.594-95.

C.    **The Federal Habeas Petition**

This timely petition followed. Petitioner sought and received an order from this Court (Larimer, D.J.) granting a stay of the petition so that he could return to state court and file a second C.P.L. § 440.10 motion again alleging that trial counsel was ineffective. See Respondent's Supplemental Appendix ("Resp't Supp.") P. The trial court summarily denied relief on January 26, 2011. See Resp't Supp. T. Petitioner's application for leave to appeal to the Appellate Division was denied on May 12, 2011.

This matter is now fully submitted. For the reasons discussed below, Borcyk's request for a writ of habeas corpus is denied, and the petition is dismissed.

III. **Analysis of the Petition**

A.    **Ineffective Assistance of Trial Counsel**

1.    **The Strickland Standard**

In order to establish ineffective assistance of trial counsel, a petitioner must show both that his attorney provided deficient representation and that he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 686-88 (1984). Deficient performance requires showing that "counsel's representation fell below an objective standard of reasonableness," and that counsel's conduct had "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 686, 688.

Prejudice requires a showing that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Although the Strickland standard is two-pronged, a reviewing court need not address both "deficient performance" and "prejudice" where the petitioner cannot meet one of the two elements. See 466 U.S. at 697 (noting that where the court can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," which will often be the case, the court should do so).

### 2. Failure to Investigate the Anonymous 911 Call

On Sunday, October 27, 2002, 911 emergency services received an anonymous tip in which the caller stated that he had information relating to the dead female recently found in Greece. According to the caller, the victim was a friend of his who was "strung out" on heroin and who had a lot of drug activity occurring at her house on Remington Street. The caller stated that this was a retaliation killing following a drug bust at her house the previous week. The caller advised that the killer was the brother of the man who had been imprisoned following the drug bust. The caller did not provide the name of the person who had been arrested following the drug bust, or the name of his brother.

According to the caller, on the night of October 25, 2002, he saw a man named Ricky Blocker at the victim's house being assisted by two unknown Hispanic males in cleaning up the crime scene. The

caller explained that Blocker lived in the Remington Avenue area, that the killers had disposed of the body in Greece, and that the three men were driving an older gray Toyota Camry. The caller indicated that he had already been shown photographs of the victim and stated he believed that she had been strangled.

In support of his two motions to vacate the judgment, Borcyk asserted that trial counsel should have introduced the transcript of this 911 call, arguing that the 911 caller's repetition of the same details provided by Sidney Lawhorn, Jr., and led to the inescapable conclusion that Sidney was the person who made the anonymous call on October 27, 2002. Motion counsel argued that trial counsel did not attempt to offer proof of the 911 call, failed to investigate the call in any way, and never obtained a transcript of the call. See Petitioner's May 2008 C.P.L. § 440.10 Motion ("First C.P.L. § 440.10 Motion") at 16, ¶¶64-65 (Resp't App. A).

In opposition, the prosecution described the allegations as "generic without any specific alleged inactions" by trial counsel. People's June 2008 Affirmation in Opposition at 5, ¶16. Furthermore, the prosecution noted, trial counsel recognized Sidney's involvement in this case and accordingly had his private investigator attempt to interview Sidney, who adamantly refused to do so. Id.

The trial court agreed that Borcyk had "neglect[ed] to independently support his conclusory assertion that his trial counsel failed to investigate the anonymous 911 call," which was

-13-

based solely upon clear hearsay. C.P.L. § 440.10 Order dated October 22, 2008 ("2008 C.P.L. § 440.10 Order") at 2. The trial courted that the record "reference[d] the subject matter of any anonymous phone call by Sidney Lawhorn on the record during the suppression hearing." Id. (citing Transcript dated June 9, 2005, at p.30, lns 12-14). In the trial court's opinion, it was fatal to Borcyk's claim that he failed to introduce an affidavit from trial counsel, or someone else with personal knowledge, as to whether trial counsel had or had not investigated the 911 call. Id. at 2-3 (citations omitted). This Court agrees with the trial court that Borcyk has failed to substantiate his claim that trial counsel did not investigate the issue of the 911 call. As the trial court noted, the record supports a finding to the contrary—that counsel was well aware of the 911 call. Borcyk, having failed to establish deficient performance by counsel in this regard, cannot succeed on his Strickland claim.

### 3.    Failure to Introduce the Anonymous 911 Call

Borcyk relatedly contends that trial counsel was ineffective because he failed to present any evidence that there was an anonymous phone call purportedly made by Sidney Lawhorn. The trial court held that this issue was readily apparent on the record and therefore should have been raised on direct appeal. Accordingly, dismissal was required under C.P.L. § 440.10(2)(c). Id. at 3. Respondent argues that the claim is procedurally defaulted because the trial court relied upon an adequate and independent state ground to dismiss it. The Supreme Court has held that claims

underlying a habeas petition may be procedurally barred from habeas review if they were decided at the state level on adequate and independent procedural grounds. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-33 (1991). The procedural bar applies when a state court's decision contains a "plain statement" that it is relying on an "adequate" state law as an "independent" basis for denying the claim. <u>Id.</u> at 722, 729.

As the Second Circuit has observed, "New York courts have held that some ineffective assistance claims are 'not demonstrable on the main record' and are more appropriate for collateral or post-conviction attack, which can develop the necessary evidentiary record." <u>Sweet v. Bennett</u>, 353 F.3d 135, 139 (2d Cir. 2003) (quotation and citation omitted)). Where, however, the alleged errors that are the basis for a petitioner's ineffectiveness claim are "particularly well-established in the trial record," <u>id.</u>, federal courts in New York have held that a state court's reliance on C.P.L. § 440.10(2)(c) to dismiss such an ineffective assistance claim operates as a procedural bar to a subsequent collateral attack by means of federal habeas. <u>E.g.</u>, <u>id.</u>

Here, however, counsel's reasons for not introducing the 911 call (the contents of which was not discussed at trial or the pre-trial hearings) are not apparent on the record. <u>Cf.</u> <u>id.</u> (finding that C.P.L. § 440.10(2)(c) was an adequate and independent state ground barring habeas review of ineffective assistance of trial counsel claim where alleged error was particularly well-established in the trial record; trial counsel "plainly failed to object on

inconsistency grounds to charging the counts in the conjunctive"). Thus, there is a question as to whether the state ground was "adequate" under the circumstances. Rather than resolve the procedural default issue, the Court elects to consider the merits of the claim, which is readily dismissed even under a pre-AEDPA standard of review.

The anonymous 911 call, which was made at least a day after Ortiz's murder, was inadmissible hearsay. See, e.g., Brown v. Keane, 355 F.3d 82, 89-90 (2d Cir. 2004) (holding that anonymous 911 call in which the caller stated that light-skinned black men, matching defendant's description, were shooting guns was not a report of a present sense impression and was not an excited utterance for purposes of satisfying an exception to the rule against hearsay); People v. Vasquez, 88 N.Y.2d 561, 576 (1996) ("Even assuming that the anonymous 911 call was made during the crime or in its immediate aftermath and that it was made by an on-the-scene observer who related events as he witnessed them, the statements in question did not qualify as admissible present sense impressions because they were not sufficiently corroborated by independent proof."). Therefore, even if trial counsel had sought to admit it, the trial court in all likelihood would have excluded it. Accordingly, Borcyk cannot demonstrate that he was prejudiced by trial counsel's decision not to seek its admission.

### 4.   Failure to Introduce the Results of the Search of Petitioner's Vehicle

Petitioner claims that trial counsel was ineffective in failing to introduce the results of the police search of his vehicle, a 1992 Honda Prelude, on December 22, 2004. The search revealed no evidence indicating that Ortiz had ever been in that car. Counsel argued, in support of Petitioner's first C.P.L. § 440.10 motion, that the negative search results tended to exonerate Petitioner and were relevant to the issue of whether he participated in the homicide. The prosecutor countered that the negative search results did not fully exonerate Petitioner, and moreover were not surprising, given that the testing occurred two years after the crime and after the car had been sold to another individual.

The trial court denied this claim pursuant to C.P.L. § 440.10(2)(c), finding that the basis for it was discernable on the trial record and therefore it should have been raised on direct appeal. The Appellate Division, however, held that the claim involved matters outside the record on appeal and thus was properly raised by means of a C.P.L. § 440.10 motion. People v. Borcyk, 60 A.D.3d 1489, 1490 (4th Dept. 2009) (citations omitted). Borcyk raised the claim again in his second C.P.L. § 440.10 motion, and the trial judge stated that despite the procedural deficiencies, she did evaluate the merits of Borcyk's claim of ineffective assistance of trial counsel. County Court Order Dated January 26, 2011 (Resp't Supp. T). This is only partially correct. Although the

-17-

trial judge did evaluate several of trial counsel's alleged errors, she did not address trial counsel's failure to introduce the negative results of the search of Borcyk's vehicle. Borcyk thus was placed in a "Catch-22" situation and was unable to obtain a ruling on the merits of the claim from the state courts.

AEDPA's deferential standard does not apply where a petitioner has presented a claim to a state habeas court but the state court failed to adjudicate it; in such case, a federal district court will address the claim de novo. Cone v. Bell, ___ U.S. ___, 129 S. Ct. 1769, 1784 (2009) ("Because the Tennessee courts did not reach the merits of Cone's [habeas] claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.' 28 U.S.C. § 2254(d). Instead, the claim is reviewed de novo.") (citing Rompilla v. Beard, 545 U.S. 374, 390 (2005) (de novo review where state courts did not reach prejudice prong under Strickland v. Washington, 466 U.S. 668, supra); other citation omitted).

Borcyk's trial counsel refused to provide him with an affidavit explaining his reasons for the various decisions challenged by Borcyk, including counsel's decision not to introduce the negative search results of the car. There does not seem to have been was a downside to introducing the reports, since there were no positive results that trial counsel did not want the jury to hear. Nevertheless, the question on habeas review is not whether this Court or a different attorney would have employed a different

strategy in trying the same case. Instead, it is whether, "strongly presum[ing] [counsel] to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[,]" Strickland, 466 U.S. at 490, the choice was an objectively unreasonable one under prevailing professional norms, id. at 687-88 (deficient performance requires a showing that "that counsel's representation fell below an objective standard of reasonableness"). In this case, it was not an objectively unreasonable decision to decline to introduce the results, for given the lengthy amount of time that had elapsed since Ortiz's murder and the search of Borcyk's vehicle, the results arguably were not especially probative. Although the negative forensics results might have been helpful to the defense, they would not have led, in all reasonable probability, to a different result had the jury considered them. The prosecution introduced DNA evidence linking Petitioner to the victim, the conclusiveness of which neither defense counsel's cross-examination nor the defense expert were able to undermine.

### 5.  **Failure to Call Tina Brown as a Witness**

Petitioner contends, for the first time in his habeas petition, that trial counsel failed to secure the testimony of an individual named Tina Brown ("Brown"). According to Petitioner, Brown had been subpoenaed to testify at trial about "an incident involving her and Reinaldo Torres," Pet., ¶22(C), the victim's boyfriend. Petitioner states that when Brown failed to appear, trial counsel said, "'Oh, well' and the trial went on." Id.

-19-

As Respondent notes, this claim is unexhausted because it was never raised in any state court application–either on direct appeal or in Borcyk's C.P.L. § 440.10 motions. This claim concerns an off-the-record matter, as there is no reference in any of the transcripts or state court records to Brown, to her being subpoenaed, or to her failure to appear. Borcyk technically could return to state court to raise this claim in a third C.P.L. § 440.10 motion and not be subject to mandatory dismissal under C.P.L. § 440.10(2)(c). However, this Court now has discretion under 28 U.S.C. § 2254(b)(2) to deny on the merits a habeas petition containing unexhausted claims. E.g., Pratt v. Greiner, 306 F.3d 1190, 1196–97 (2d Cir. 2002); Smith v. Texas, 550 U.S. 297, 324 (2007) ("In the absence of any legal obligation to consider a preliminary nonmerits issue, a court may choose in some circumstances to bypass the preliminary issue and rest its decision on the merits.") (citing 28 U.S.C. § 2254(b)(2) (federal habeas court may reject claim on merits without reaching question of exhaustion)).

Section 2254(b)(2) does not set forth a standard for determining when a court should dismiss a petition on the merits rather than requiring complete exhaustion. Lambert v. Blackwell, 134 F.3d 506, 516 (3d Cir. 1997). While neither the Supreme Court nor the Second Circuit has established what standard a district court should use to determine when to dismiss a petition on the merits rather than requiring complete exhaustion, several habeas courts in this Circuit have expressed the test as whether the

unexhausted claim is "patently frivolous." E.g., Colon v. Johnson, 19 F.Supp.2d 112, 120, 122 (S.D.N.Y.1998); Hogan v. Ward, 998 F.Supp. 290, 293 (W.D.N.Y.1998).   Other district courts in this Circuit, as well as the Third, Fifth, and Ninth Circuits, have held that Section 2254(b)(2) embodies the Supreme Court's pre-AEDPA holding in Granberry v. Greer, 481 U.S. 129, 135 (1987), that a court may deny an unexhausted claim on the merits if it is "'perfectly clear that the applicant does not raise even a colorable federal claim.'" Fayton v. Connolly, No. 06 Civ. 3685(SAS), 2009 WL 1615995, at *4 & n. 45 (S.D.N.Y. June 9, 2009) (quoting Cassett v. Stewart, 406 F.3d 614, 623 (9th Cir. 2005); other citations omitted).  Borcyk's claim fails under either standard.

"[C]ounsel's decision as to 'whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201-02 (2d Cir. 2000) (quotation omitted). "[A] petitioner may not merely allege that certain witnesses might have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result." Edmonds v. Purdy, No. 08 Civ. 8808(DLC)(AJP), 2009 WL 483189, at *19 (S.D.N.Y. Feb. 26, 2009) (citing Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) ("To affirmatively prove prejudice [from counsel's failure to investigate], a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also

that those witnesses would have testified at trial."), cert. denied, 513 U.S. 1161 (1995); Greenidge v. United States, No. 01 CV 4143, 2002 WL 720677, at *2 (E.D.N.Y. Mar. 27, 2002) (§ 2255 petitioner's ineffective assistance of counsel claim had no merit where petitioner "nowhere specifie[d] how the testimony of those witnesses [counsel purportedly failed to call] would have been helpful to his defense")), report and recommendation adopted, 08 CIV.4388(PKC), 2008 WL 4369314 (S.D.N.Y. Sept. 25, 2008).

Here, the Court has nothing on which to judge the reasonableness of counsel's decision not to pursue Brown as a witness, or the prejudice, if any, that accrued to Borcyk. Borcyk's pleadings completely fail to set forth the particulars regarding Brown's proposed testimony, and he has not supplied the Court with an affidavit from Brown affirming that she would have, in fact, testified at trial. All Borcyk states is that Brown would have testified about an "incident" involving the victim's then-boyfriend, Torres. That statement provides no useful information whatsoever. A court cannot grant habeas relief based upon unsubstantiated conclusions, opinions or speculation. See Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (asserting that federal courts should not grant "habeas relief on the basis of little more than speculation with slight support").

### 6.  Erroneous Advice Regarding the Decision to Testify

Borcyk contends that trial counsel gave him faulty advice regarding the decision whether or not to testify. In particular, Borcyk claims that his attorney counseled him not to testify

because he had a 1997 conviction for bank robbery in which, Borcyk says, he handed a note asking for $300 to the bank teller. Borcyk states that he was unarmed, and the he turned himself in two days later.

The Court has reviewed the hearing held pursuant to People v. Sandoval, 34 N.Y.2d 371 (1974), to determine the extent to which the prosecutor would be permitted to cross-examine him about particular criminal (charged or uncharged), vicious, or immoral conduct for the purpose of impeaching credibility should he testify at trial. See T.55-60. The charges at issue were a misdemeanor DWI form 1993; a 1997 felony conviction from California for unarmed robbery; and a 2001 violation of probation in New York due to cocaine use. The trial court ruled that the prosecution could not inquire as to the DWI or the cocaine charge. T.57, 58. The trial court ruled that the prosecution could elicit that Borcyk had violated the terms of his parole but not the reason for the violation. T.59. The prosecution was also permitted to elicit that he had a federal felony conviction, but could not inquire as to the underlying facts because of the danger of prejudice. T.58.

As an initial matter, Borcyk has mischaracterized the Sandoval ruling, and the extent of the cross-examination permitted concerning the bank robbery conviction. As noted above, the prosecution was not permitted to elicit testimony concerning the nature of that felony conviction. In any event, Borcyk has not shown that his attorney's performance prejudiced his right to a fair trial. Borcyk has not intimated what evidence he would have

provided or shown that it would have had any effect on the verdict, much less the "reasonable probability" of an acquittal. See Brown v. Artuz, 124 F.3d 73, 81 (2d Cir. 1997) (failure of defense counsel to advise petitioner that he enjoyed a fundamental right to testify in his own defense in murder case did not prejudice defense; although petitioner claimed he would have testified that he feared for his life during his fight with victim because of past encounters, such testimony would not have supported his justification defense, in view of evidence that victim was unarmed and that defendant could have retreated). As Borcyk has failed to demonstrate prejudice, the Court need to address whether counsel's performance was deficient. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").

## V.   Conclusion

For the reasons stated above, Gregory Borcyk's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Borcyk has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:      April 13, 2012
            Rochester, New York.